IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FEB I 7 2009

CLI...

BRADLEY HORNER,                        )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        Civil Action No. 1:08cv0152 (JFA)
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )
_____)

## MEMORANDUM OPINION

This matter is before the Court on cross-motions for summary judgment.[1]  On April 25,

2007 Defendant Commissioner denied Plaintiff Bradley Horner's application for Social Security

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42

U.S.C. § 401, *et seq.*, and his application for Supplemental Security Income payments ("SSI")

under Title XVI of the Act.  The Commissioner's decision was based on a finding by the

Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the Act and

applicable regulations.  In his Complaint, Plaintiff seeks judicial review of the Commissioner's

decision pursuant to 42 U.S.C. § 405(g).

For the reasons set forth herein, the Plaintiff's motion for summary judgment (Docket no.

20) will be denied, the Defendant's motion for summary judgment (Docket no. 16) will be

granted and the final decision of the Commissioner will be affirmed.

---

[1] The Administrative Record in this case has been filed under seal, pursuant to Local
Civil Rules 5 and 7(C). (Docket nos. 9, 10). In accordance with these Rules, this Memorandum
Opinion excludes any personal identifiers such as Plaintiff's social security number and date of
birth (except for year of birth) and the discussion of Plaintiff's medical information is limited to
the extent necessary to analyze the case.

## PROCEDURAL HISTORY

Plaintiff filed claims for DIB and SSI payments on September 8, 2003. (AR 112-14, 530-32). In those applications, Plaintiff stated that he suffered a disability within the meaning of the Act and that he became unable to work because of his disabling condition on August 22, 2001. (AR 112, 530). In his initial Disability Report (AR 119-28), Plaintiff listed the injury or condition limiting his ability to work as having had spinal surgery performed to relieve pressure on nerves which caused the right side of his body to become paralyzed. (AR 120). Plaintiff stated that the surgery limited his ability to work because he could not use his right hand, arm or leg, he could not focus his eyes and he felt as though he was "passing out." (AR 120). Plaintiff indicated that he was treated by several doctors for seizures, the feeling of oncoming seizures and extreme pain and paralysis. (AR 122-23). Plaintiff also stated that he was hospitalized for a cervical diskectomy in February 2001 and for a seizure in January 2003. (AR 123-24).

Dr. William C. Amos and Disability Examiner Phoebe Chatham issued an initial disability determination on December 2, 2003 diagnosing Plaintiff with discogenic/degenerative back disorder and affective disorders, but finding that he was not disabled. (AR 69, 533). Plaintiff's claims were thereafter denied by the Regional Commissioner, Larry Massanari, on December 4, 2003. (AR 534-38). In making his decision, the Regional Commissioner considered reports concerning Plaintiff's medical treatments from Dr. Naurang Gill, Dr. Paymaun Lotfi and Potomac Hospital. (AR 534).

Plaintiff requested reconsideration of the denial of benefits on December 20, 2003. (AR 83-84). After an independent review of Plaintiff's claim, Dr. Luc Vinh and Disability Examiner Vilya Chin issued a similar disability determination on March 19, 2004. (AR 70). Relying on that disability determination, Regional Commissioner Laurie Watkins denied Plaintiff's request

for reconsideration on March 23, 2004, noting that in addition to the medical reports already in the file she also considered a report from Dr. Craig Fockler in making her determination. (AR 85-87, 539-41).

Plaintiff filed a request for hearing before an Administrative Law Judge on March 25, 2004. (AR 88). Pursuant to that request, a hearing before ALJ Eugene Bond was scheduled for August 17, 2004. (AR 95-99). At that hearing, Plaintiff was represented by counsel and testimony was given by the Plaintiff and by a vocational expert, Adena Leviton. (AR 34-51). On October 28, 2004 the ALJ issued a decision denying Plaintiff's applications and finding that Plaintiff was capable of performing his past relevant work as a computer operator (AR 77), as well as performing other occupations with jobs that exist in significant numbers in the national economy, such as assembler II, pre-assembler or mail clerk. (AR 71-79).

On November 8, 2004 Plaintiff, by counsel, filed a request for review of hearing decision with the Social Security Administration Office of Hearings and Appeals (the "Appeals Council"). (AR 104-06). On January 13, 2005 the Appeals Council granted the request for review under the substantial evidence provision of the Social Security Administration regulations, 20 C.F.R. §§ 404.970 and 416.1470. (AR 108). Pursuant to 20 C.F.R. §§ 404.977 and 416.1477, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's case in order to obtain: (1) an evaluation of Plaintiff's mental impairment under 20 C.F.R. §§ 404.1520a and 416.920a; (2) consideration of Plaintiff's bilateral carpal tunnel syndrome; (3) an evaluation of the treating source opinion (Dr. Gill) that Plaintiff was limited to less than sedentary work activity; and (4) an adequate evaluation of Plaintiff's subjective complaints pursuant to 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p. (AR 107-110). The Appeals Council further instructed the ALJ to obtain additional evidence concerning Plaintiff's mental

impairment in order to comply with the regulatory standards found in 20 C.F.R. §§ 404.1512-13 and 416.912-13; to give further consideration to Plaintiff's residual functional capacity and provide specific references to the evidence of record showing a proper evaluation of treating source opinions and functional findings by nonexamining sources as required by 20 C.F.R. §§ 404.1527 and 416.927 and 20 C.F.R. §§ 404.1513(c) and 416.913(c) and Social Security Rulings 96-2p and 96-5p; and finally, to obtain supplemental evidence from a vocational expert to clarify the demands of Plaintiff's past relevant work and/or the effect of assessed limitations on Plaintiff's occupational base under 20 C.F.R. §§ 404.1560(b)(2) and 416.960(b)(2) and Social Security Ruling 83-14. (AR 108-09).

ALJ Bond held another hearing on May 19, 2005. Plaintiff was represented by his counsel and testimony was given by the Plaintiff and by another vocational expert, Tanya Hubacker. (AR 52-68). On June 27, 2005 the ALJ issued his decision denying Plaintiff's applications. (AR 435-47). After considering Plaintiff's age, education, work experience and residual functional capacity, the ALJ found that while Plaintiff was unable to perform any of his past relevant work, he was capable of performing unskilled light jobs such as counter clerk, router or blueprint trimmer, as well as unskilled sedentary jobs such as document preparer, which exist in significant numbers in the national economy. (AR 445-47).

On August 10, 2005 Plaintiff filed a request for review of hearing decision claiming the ALJ's decision was not supported by substantial evidence. (AR 15-16). The Appeals Council found no basis for review and denied Plaintiff's request on October 21, 2005. (AR 12-14).

On November 25, 2005 Plaintiff, by counsel, filed a Complaint in this Court, captioned *Bradley Horner v. Jo-Anne B. Barnhart, Commissioner for Social Security*, 1:05cv1368 (TSE/TCB), seeking judicial review of the Commissioner's decision. (AR 450-51). Upon the

agreement of the parties and without any substantive review by the Court, the Court entered an Order remanding the case to the Appeals Council pursuant to 42 U.S.C. § 405(g) on April 11, 2006 for further consideration by the ALJ.

On September 19, 2006 the Appeals Council vacated the final decision of the Commissioner and remanded Plaintiff's case for further proceedings. (AR 452-56). In the remand order, the Appeals Council indicated that the ALJ failed to evaluate Plaintiff's mental impairment in the manner required by 20 C.F.R. §§ 404.1520a and 416.920a; specifically, the decision did not address criteria found in paragraphs B and C of those sections. (AR 454). The Appeals Council noted that Plaintiff's seizure disorder was found not to be severe because it was controllable with medication and Plaintiff's compliance with treatment, even though Plaintiff's treating physician, Dr. Gill, indicated that Plaintiff still experienced "frequent breakthrough seizures" which suggested that the seizures were not controlled. (AR 454). The Appeals Council stated that updated evidence regarding Plaintiff's seizure disorder would be helpful. (AR 454). The Appeals Council found that the ALJ's decision did not evaluate properly or address the weight afforded to Dr. Gill's opinion and it did not assess adequately Plaintiff's ability to meet strength demands of the work the ALJ found Plaintiff capable of doing. (AR 454-55). The Appeals Council ordered the ALJ to give further consideration to Plaintiff's residual functional capacity and directed the ALJ to clarify which of Plaintiff's subjective complaints he found credible and those he did not. (AR 454-55). The Appeals Council ordered that Plaintiff's case be assigned to a different ALJ upon remand. (AR 456).

ALJ Clifford Sturek was assigned Plaintiff's case and on December 7, 2006 he wrote to Plaintiff's counsel requesting a statement from Plaintiff's treating physician regarding whether Plaintiff's seizure disorder is controlled with medication. (AR 478). Plaintiff was examined by

5

Dr. Gill on February 15, 2007 (AR 519) and on March 5, 2007 Dr. Gill completed a Residual

Functional Capacity Questionnaire (AR 520-22). Plaintiff was examined by Dr. Anthony Hsiao

on February 26, 2007 and a Physical Residual Functional Capacity Questionnaire was prepared

based upon that examination. (AR 516-18). Plaintiff's counsel submitted additional medical

records to ALJ Sturek on January 18, 2007, March 1, 2007, March 5, 2007 and March 12, 2007.

(AR 503, 512, 519, 523).

Another hearing was conducted on March 8, 2007 and testimony was given by Plaintiff,

who was assisted by Andrew Mathis a "Disability Advocate", and Leonard Perlman, a vocational

expert. (AR 568-621). On April 25, 2007 ALJ Sturek issued a decision (AR 411-25) finding

that considering Plaintiff's age, education, work experience and residual functional capacity, and

considering the factors enumerated by the Appeals Council in its remand order, Plaintiff was

capable of performing unskilled light jobs, such as office helper and stock checker, as well as

unskilled sedentary jobs, such as surveillance system monitor and telephone order clerk, which

exist in significant numbers in the national economy. (AR 423-24).

Plaintiff filed exceptions to the ALJ's decision on May 18, 2007, claiming the ALJ

improperly rejected the treating physicians' assessments, improperly ignored the effects of

Plaintiff's impairments and omitted consideration of Plaintiff's functional limitations. (AR 403-

10). On December 22, 2007 the Appeals Council declined to assume jurisdiction, finding that

the ALJ adequately explained the reasoning in his decision. (AR 396-98).

Plaintiff, by counsel, filed a civil action for review of the Commissioner's final decision

on February 20, 2008, within 60 days of the final decision. 42 U.S.C. § 405(g). On March 4,

2008 this Court granted Plaintiff's Motion for Leave to Proceed *in forma pauperis*. (Docket no.

4). The Commissioner filed an Answer to the Complaint on May 8, 2008 (Docket no. 5), along

6

with the Administrative Record (Docket no. 9). On August 22, 2008 this Court entered an

Agreed Order providing that Defendant would file his motion for summary judgment by

September 15, 2008, Plaintiff would file his cross-motion for summary judgment/opposition to

Defendant's motion for summary judgment by October 6, 2008 and Defendant would file his

reply memorandum/memorandum in opposition to Plaintiff's cross-motion for summary

judgment by October 20, 2008. (Docket no. 13). On September 15, 2008 Defendant filed his

motion for summary judgment and memorandum in support. (Docket nos. 16, 17). Plaintiff

filed his motion for summary judgment and memorandum in support on October 6, 2008 (Docket

nos. 20, 21) and Defendant filed his opposition to Plaintiff's motion on October 20, 2008

(Docket no. 22) as contemplated by the Court's Order. On November 12, 2008, the District

Judge entered an Order Referring Case to the undersigned Magistrate Judge pursuant to 28

U.S.C. § 636(c) (Docket no. 23) following the filing of consent forms by both parties (Docket

nos. 14, 15).

## FACTUAL BACKGROUND FROM THE ADMINISTRATIVE RECORD

### Plaintiff's age, education and employment history

Plaintiff was born in 1958. (AR 112). Plaintiff can read, speak and write in English.

(AR 119). He completed high school in 1977 and computer operations management training in

1985. (AR 126). Plaintiff was employed previously as a computer operator and as a tariff

analyst. (AR 121). Plaintiff states his injuries first began to bother him in July of 1987 and he

became incapable of working as of August 22, 2001. (AR 112, 120).

### Chronology of Plaintiff's medical records from the Administrative Record

After Plaintiff complained of neck, arm and leg pain, Dr. Jossan ordered a MRI of

Plaintiff's cervical spine that was performed on December 2, 2000. (AR 217). The MRI

revealed no discrete disc herniation causing impingement on the thecal sac, but it did show bilateral multilevel foraminal stenosis related to hypertrophic changes at the unco joints, and to a lesser degree involving the facet joints. (AR 217).

On December 13, 2000 Dr. Paymaun Lotfi examined the Plaintiff at the request of Dr. Jossan. (AR 210-12). Dr. Lotfi reviewed Plaintiff's MRI and noted a hypolordotic cervical spine with cervical spondylosis throughout the cervical spine, most significantly at C5-C6, which was moderate to severe, and at C6-C7, which was severe. (AR 211). He noted a posterior disk osteophyte complex on both the right and left side, worse on the right, and significantly decreased disk height with end plate sclerosis. (AR 211-12). Dr. Lotfi diagnosed Plaintiff with cervical spondylosis, cervical radiculopathy at the C-7 level and possible cervical stenosis. (AR 212). Dr. Lotfi recommended that the Plaintiff return in three weeks after obtaining x-rays, CT scans and a report from Dr. Warner, at which point he would consider recommending Plaintiff for surgery. (AR 212). Dr. Lotfi expressed a desire that Plaintiff cease smoking (15 cigarettes a day) and reduce his alcohol consumption (2 beers a day) prior to any surgery. (AR 211-12).

On December 18, 2000 Plaintiff had x-rays, a cervical myelogram and a CT cervical myelogram performed at Prince William Hospital. (AR 214-16). The radiology report revealed degenerative changes in the cervical spine, particularly from the C3-4 through C6-7 levels. (AR 214). That report also noted disc space narrowing, endplate spurring, particularly prominent at the C4-5, C5-6 and C6-7 levels and bilateral foraminal narrowing. (AR 214). The cervical myelogram showed a moderate filling defect on the right impressing upon the thecal sac at the C6-7 level and a smaller rounded filling defect on the right at the C4-5 level. (AR 214). The CT cervical myelogram confirmed prominent uncovertebral joint degenerative change at the C3-4, C4-5, C5-6 and C6-7 levels, mild foraminal narrowing and filling defects. (AR 214-16).

Plaintiff was examined at Potomac Hospital on December 28, 2000 by Dr. Sigmon who indicated that cervical surgery was planned and that Plaintiff was a medically low risk for the planned procedure. The report disclosed Plaintiff's cervical disc disease, non-viral hepatitis, psoriasis and seizure disorder. (AR 220-21). Dr. Sigmon had Plaintiff's blood checked (AR 218-19) and suggested that Plaintiff use a nicotine patch (AR 220).

On January 4, 2001 Plaintiff returned to Dr. Lotfi. Dr. Lotfi reviewed the results of the CT mylogram, the MRI and x-rays with the Plaintiff and discussed the possibility of Plaintiff undergoing either a diskectomy or a corpectomy. Dr. Lotfi noted large posterior osteophytes at C5-C6 and C6-C7, with mass effect at C6-C7 on the right side. (AR 209). Plaintiff complained of occasional numbness and tingling all the way down his right leg and neck pain, although with a temporal relationship. Dr. Lotfi asked Plaintiff to return in ten days in order to obtain and analyze another MRI, at which time he would schedule Plaintiff for surgery with Dr. Jossan. (AR 209).

On January 31, 2001 Plaintiff underwent a chest x-ray which indicated no evidence of parenchymal infiltrate or vascular congestion. (AR 237).

Plaintiff underwent an Anterior Cervical Diskectomy and Fusion ("ACDF") on February 2, 2001. (AR 228-54). Dr. Lotfi's preoperative diagnosis was C5-C6, C6-7 disk herniation, foraminal stenosis, degenerative disk disease, hard disks, and right upper extremity C6 and C7 radiculopathy. (AR 233). Dr. Lotfi reported that MRI studies as well as CT-myelograms showed multilevel degenerative disk disease with severe foraminal stenosis secondary to posterior hard osteophytes as well as redundant disks, which were most notable at C5-6 and C6-7 levels. Plaintiff also had some evidence of degeneration at C4-5 disk. Plaintiff's symptoms were primarily in the C7 distribution. (AR 233-34). Dr. Lotfi reported that Plaintiff was tried on

anti-inflammatories, physical therapy and steroid medication which provided temporary symptomatic relief, but that he ultimately requested surgical intervention. (AR 233). Dr. Lotfi noted Plaintiff's history of alcohol consumption and smoking, which Plaintiff indicated that he had ceased both behaviors prior to the surgery. (AR 234).

Dr. Lotfi and Dr. Jossan performed the various surgical procedures on the Plaintiff on February 2, 2001. Dr. Lotfi's postoperative diagnosis was C5-C6, C6-7 disk herniation, foraminal stenosis, degenerative disk disease, hard disks and right upper extremity C6 and C7 radiculopathy. (AR 233). He reported that Plaintiff was immediately neurovascularly intact in the recovery room, that his arm pain had near totally resolved and that sensation had significantly improved. Dr. Lotfi reported no complications with the surgery. (AR 236). Dr. Jossan's postoperative diagnosis was consistent with Dr. Lotfi's diagnosis -- degenerative disk disease of the cervical spine, levels C5-C6 and C6-C7 and cervical nerve root compression at C5-C6 and C6-C7. (AR 250-51).

Several portable lateral views of Plaintiff's cervical spine were performed during and after the surgery, at 8:55 a.m. (noting a surgical probe in the anterior aspect of C6, C7 disk space), 9:20 a.m. (noting metallic surgical probes at the C5-6 and C6, C7 levels), 12:25 p.m. (noting that the surgical probe was removed, and evidence of anterior fusion with a metallic surgical plate from C5 to C7, and grafts to the C5-6 and C6, C7 disk spaces) and 12:29 p.m. (noting metallic surgical plate extending from C5 to C7). (AR 239). Plaintiff was discharged from the hospital on February 3, 2001. (AR 224, 254).

On February 8, 2001, Plaintiff reported to Dr. Lotfi, noting that he had been having some difficulty sleeping, secondary to pain in his right arm and shoulder. Dr. Lotfi noted that Plaintiff's sensation in his right hand was much improved since the ACDF operation and that his

10

pain was significantly better than last night. (AR 208). Dr. Lotfi prescribed Percocet and told Plaintiff to take it easy at home, continue not to smoke and to return in one week. (AR 208).

Plaintiff returned to Dr. Lotfi on February 19, 2001, seventeen days after the ACDF. Dr. Lotfi remarked that Plaintiff was doing "remarkably well" and that Plaintiff reported having almost all of the feeling back in his right hand. He reported that his right leg pain was completely resolved but he was having some pain in his shoulder. Plaintiff stated that he felt he was able to work now, which he had been unable to do since September 2000. (AR 207). Dr. Lotfi remarked that Plaintiff could return to work, that he would write him a note and that Plaintiff should try to decrease his Percocet intake from three per day. (AR 207).

On March 8, 2001 Plaintiff had films of his cervical spine reported taken at Prince William Hospital. The diagnostic report revealed fusion at C5-6 and C6-7 level, resulting in obliteration of disc spaces there. There was C4-5 disc space narrowing, which was essentially the same as previously, along with anterior spurring. (AR 213). The films showed very prominent spurring on the right at C6-7. The impression indicated there was an overall decrease in size of the foramina and there was more prominent spurring occurring at the C6-7 level on the right. (AR 213).

Dr. Lotfi reported seeing Plaintiff on March 12, 2001. (AR 206). Dr. Lotfi observed again that Plaintiff was doing remarkably well and that his pain was approximately 90% improved, with no more tightening in his right hand, full dexterity and no right leg pain. Plaintiff had returned to work four hours per day, stopped taking Percocet and had almost no pain in his right shoulder. (AR 206). Dr. Lotfi recommended that Plaintiff continue to wear his Aspen collar for three more weeks, but that he work as much as possible and return for a visit in two months. (AR 206). He also noted that Plaintiff had good range of motion in his cervical spine

11

and that the x-rays revealed that the hardware and iliac crest bone grafting were intact. (AR 206).

Plaintiff returned to Dr. Lotfi on May 14, 2001, complaining of a lack of energy and inability to get out of bed in the morning, some right posterior shoulder pain, but no pain radiating into his hands or weakness in bilateral upper extremities. Dr. Lotfi also noted a very nice recovery of Plaintiff's arm and shoulder pain. (AR 203). Dr. Lotfi assessed that Plaintiff was recovering from C5-C6 and C6-C7 ACDF surgery and that it was possible that he had chronic fatigue or depression. He reported that he wrote Plaintiff a note explaining to his employer Plaintiff's inability to work more than four hours a day for the next two months. Dr. Lotfi requested that Plaintiff get x-rays of his neck but Dr. Lotfi did not feel that Plaintiff's fatigue was secondary to his neck issues and reported that he thought Plaintiff should visit his medical doctor for that condition. (AR 203).

On May 24, 2001 Plaintiff told Dr. Lotfi he was experiencing left posterior shoulder pain and occasional tingling in his hand. (AR 205). His overall malaise, which was diagnosed as food poisoning, was resolved and he was feeling much better. Dr. Lotfi reported good range of motion of the neck without any pain and minimal pain in his shoulder. He further reported that x-rays (AR 204) showed good incorporation of the graft at C5-C6 and C6-C7, some settling between C5 and C6 in the top of the construct and some evidence of degenerative disk disease at C4-C5. (AR 204-05). His assessment was mild posterior shoulder pain on the left side and he recommended that Plaintiff start taking Celebrex and wear his cervical collar when he experiences pain. (AR 205).

On July 18, 2001 Plaintiff reported to Dr. Lotfi complaining of pain in the bilateral upper extremities in posterior arms from shoulder to elbow and some bilateral posterior scapular pain.

(AR 201). Plaintiff also complained of some numbness in the bilateral upper extremities, which was a new finding. (AR 201). Dr. Lotfi ordered x-rays of Plaintiff's cervical spine and a CT myelogram of the cervical spine to see if there was any degeneration or stenotic changes. (AR 201).

On July 24, 2001 Lisa Pansegrouw, Human Resources Manager at ATPCO, Plaintiff's employer, sent a letter to Dr. Lotfi explaining that she had previously given a letter to Plaintiff to deliver to Dr. Lotfi, but it had apparently never reached him. (AR 198-200). She explained that Plaintiff had not been to work at all for several weeks and that it was her understanding that Plaintiff was able to work four hours a day, five days a week. Ms. Pansegrouw requested further parameters as to Plaintiff's ability to work. (AR 198-200). Handwritten notes indicate a degree of urgency to the matter and the possibility that someone in Dr. Lotfi's office had a conversation with Ms. Pansegrouw on July 27, 2001 regarding how to accommodate Plaintiff while maintaining the company's productivity. Another note indicates that Plaintiff informed Dr. Lotfi's office that Plaintiff's employment had been terminated. (AR 198).

On August 15, 2001 Plaintiff reported to Prince William Hospital for a cervical myelogram and a CT of his cervical spine. (AR 191, 255-58). The radiology report for the cervical myelogram noted that there were no large areas of stenosis identified, but there were some areas of mild impression upon the ventral thecal sac related to end plate and uncovertebral joint degenerative change spurring. (AR 191, 258). The radiology report for the CT cervical spine indicated that the alignment was grossly intact. (AR 256-57). There were some areas of uncovertebral joint degenerative change at the C3-4 through C6-7 levels and mild to moderate foraminal narrowing related to bony degenerative change. (AR 257). No new disc herniation was found and the filling defect that had previously been noted was less apparent. (AR 256-27).

13

On September 6, 2001 Plaintiff had a set of films taken to examine his cervical spine in flexion/extension. (AR 192). The x-rays revealed degenerative disk change at C4-5 with some degenerative changes at C5-6 and C6-7 with osteophyte formation. (AR 192). There was mild neural canal narrowing at C4-5 and possibly C5-6. On flexion and extension, there appeared to be a 2 mm anterior subluxation at C4-5. (AR 192).

On September 27, 2001 Plaintiff returned to Dr. Lotfi for evaluation of his neck. (AR 185). Dr. Lotfi reviewed the CT scan and the flexion and extension x-rays, which showed solid fusion and good decompression of the previously operated levels at C5-6 and C6-7. Dr. Lotfi noted that there was mild movement at the C4-5 level on the flexion and extension views but there was no evidence of significant instability. (AR 185). Dr. Lotfi indicated that he discussed his findings with Plaintiff and that he had discussed fusion of C4-5 with Plaintiff previously. Since the Plaintiff continued to complain of pain, Dr. Lotfi stated that Plaintiff might benefit from pain management and would refer him to Dr. Nagia for that purpose. (AR 185).

On October 18, 2001 Plaintiff was seen by Dr. A.H. Nagia for his upper back pain. (AR 189-90). Dr. Nagia's Consultation Report indicated that Plaintiff's chief complaints were upper back pain and right shoulder pain which began a few months ago. The pain was worsening and was exacerbated by prolonged standing and physical activity in general. (AR 189). Dr. Nagia noted Plaintiff's cervical laminectomy C5-C6 and toe amputations and also that Plaintiff smoked ten (10) cigarettes a day and drinks alcohol occasionally. (AR 189). Plaintiff's pain was ranked 6 out of 10, but with no apparent distress. (AR 189). Dr. Nagia emphasized that at the examination Plaintiff had alcohol on his breath. (AR 189). After full examination, Dr. Nagia located two tender trigger points at the medial border of the right scapula and the base of the neck. (AR 190). He noted his impressions of upper back pain, myofacial pain syndrome with

14

multiple trigger points, upper back and neck and depression. (AR 190). Dr. Nagia prescribed Zoloft and Mobic, indicated that Plaintiff could return to normal activities as tolerated and that he would schedule trigger point injections at two locations. (AR 190).

On January 30, 2002, Plaintiff executed an authorization for the release of confidential information from Dr. Lotfi to the Virginia Department of Rehabilitative Services (AR 187-88). The Administrative Record does not include any materials reflecting that Plaintiff sought significant medical attention in 2002.

On January 17, 2003 Plaintiff was examined by an internal medicine specialist, Dr. Anthony Hsiao but the office note does not reveal the purpose of that visit. (AR 523, 529). Three days later, on January 20, 2003, Plaintiff was admitted to Potomac Hospital for evaluation of a seizure disorder. (259-307). Plaintiff claimed to have been suffering from seizures since 1991, with three total seizures occurring in 1991 and 1992, but none since then. (AR 263). He reported to have taken Dilantin for three or four years, which was subsequently discontinued, and stated that he had suffered three seizures over the past weekend. (AR 263). Dr. Robinson, the examining doctor, noted that a brain CT scan was unremarkable, though it suggested greater atrophy than what would be expected for someone of Plaintiff's age (AR 263, 285) and a chest x-ray indicated no evidence of parenchymal infiltrate and was otherwise unremarkable except for mild degenerative changes of the thoracic spine at multiple levels with mild anterior wedging of a mid thoracic vertebral body. (AR 286). Dr. Robinson noted that Plaintiff drank four to five cans of beer intermittently and smoked ten cigarettes a day. (AR 286). After examination, Dr. Robinson recorded his impressions that Plaintiff had a seizure disorder and that a work up and evaluation were in progress. Dr. Robinson wrote that Plaintiff had a history of Hepatitis C and abnormal liver function studies, a history of chronic pain, alcohol and tobacco use and

thrombocytopenia.  (AR 264).  Dr. Robinson recorded his plan to admit the Plaintiff for further consultations, tests and studies.  (AR 264-65).

Dr. Robinson referred Plaintiff to Dr. Cohen, who also conducted a physical examination of Plaintiff.  (AR 266-67).  Dr. Cohen noted that according to Plaintiff's wife, he was a heavy drinker.  (AR 266).  Dr. Cohen conducted an electroencephalogram due to Plaintiff's apparent withdrawal seizure and noted that increased fast activity was consistent with benzodiazepine effect.  (AR 288).  Dr. Cohen recorded his impressions that Plaintiff suffered from delirium tremens and alcohol withdrawal seizures.  (AR 267).  He recommended that Plaintiff be kept in an intensive care setting where benzodiazepine treatment could be monitored carefully.  (AR 267).  He agreed with Dr. Robinson's thiamine prescription and advised that Plaintiff's serum magnesium and potassium levels needed to be closely watched.  (AR 267).

Plaintiff was examined by Dr. Atul Marathe for evaluation of abnormal liver enzymes.  (AR 268-70).  Plaintiff was unable to give a "great history" due to confusion and slowing but recalls that he had problems with seizures in the past.  (AR 268).  Dr. Marathe found that Plaintiff's elevated liver enzymes could be due to alcohol, seizure or hepatitis, but the etiology was unclear.  (AR 269).  The etiology of Plaintiff's seizure disorder was also unclear.  (AR 269).  Dr. Marathe noted that it was unclear whether Plaintiff had a problem with alcohol abuse but that he did abuse tobacco.  He also noted thrombocytopenia and hyponatremia, both of which could be attributable to liver disease, but since there were no other findings that would explain liver disease, additional studies were needed.  (AR 269).  Dr. Marathe concluded that he agreed with hepatitis serologies and would continue to follow Plaintiff's enzymes and check for other causes of elevated liver enzymes.  He noted to watch for DTs, continue workups of seizures, hyponatremia and thrombocytopenia and try to obtain Plaintiff's old records.  (AR 270).

On January 21, 2003 "pulmonary" notes reveal that plaintiff was more cooperative but still confused and mildly agitated, requiring Ativan. (AR 299). The notes state that Plaintiff developed full blown DTs the previous night. (AR 295). The notes also indicate that Plaintiff's seizure disorder was stable as was his thrombocytopenia, but that with regard to his delirium tremens he was still intermittently agitated. (AR 299).

On January 22, 2003 Plaintiff was referred for an assessment of his psychological needs. (AR 296). Those notes indicate that Plaintiff was admitted due to alcohol withdrawal seizures and he seemed somewhat agitated. (AR 299). Plaintiff's wife reported that Plaintiff drinks beer from the time he gets up in the morning until he goes to bed at night and that he had been drinking heavily for two years. (AR 296). It was reported that Plaintiff was in Prince William Hospital Detox for two days last October, but did not comply with outpatient care. (AR 296). Other notes for January 22, 2003 under the heading "Neurology" read "states his neck feels 'wonderful', states he will go to AA – states he has a sponsor." The notes also reflect DTs were resolving. (AR 296).

Notes from January 23, 2003 indicate that Plaintiff was agitated, pulled out his IV, refused another IV site insertion and stated that he was leaving. (AR 306). At the request of Plaintiff's wife, a social worker met with Plaintiff on January 24, 2003. During that visit, he appeared much calmer and stated that he was amenable to going to an alcohol rehab facility. (AR 301). On January 24, 2003 neurology notes reflect DTs resolved. (AR 302). Plaintiff met with a social worker on January 25, 2003 to discuss facilities for inpatient treatment. (AR 304).

Plaintiff was discharged from the hospital on January 25, 2003. (AR 307). The principal discharge diagnosis was alcohol withdrawal delirium with secondary diagnoses of convulsions, hyposmolality, thrombocytopenia and tobacco use disorder. (AR 260).

17

Plaintiff was seen by Dr. Hsiao on April 4, 2003 but the notes of that visit are unclear other than a note that Plaintiff had been drinking for three years, was in rehab for 18 days and was taking the noted medications. (AR 529).

Plaintiff next reported to Potomac Hospital on April 16, 2003. (AR 321-38). Plaintiff was referred to Potomac Hospital after a stay at the Roxbury Treatment Center in Pennsylvania for alcoholism between February 28, 2003 and March 18, 2003. (AR 323). Plaintiff's complaint was major depression. (AR 321). Plaintiff claimed that he had been deteriorating ever since 2001 when he had cervical surgery and that he had been drinking since then. (AR 323). He reported that he lost his job of 14 years as an analyst for the airlines and his wife recently left him. (AR 323). He claimed to live with his mother and attended Alcoholics Anonymous meetings four times a week. (AR 323). Plaintiff filed bankruptcy a year ago and had difficulty sleeping. (AR 323). A psychiatrist in Pennsylvania prescribed Zoloft and Remeron. He had a six-pack a day habit with alcohol for the past three years, he smoked heavily for 30 years and he had a driving under the influence arrest and a drunk in public arrest in the past. (AR 323). Plaintiff reported having recurrent severe pain since the ACDF along with feelings of paralysis on the right side and was consulting with physicians for the pain. He was also applying for disability at that time. (AR 323). Dr. Peter Campbell recorded his impressions that Plaintiff was alert, oriented with unexceptional thought process. (AR 323). Plaintiff appeared to have at least average intelligence and verbal capacity. (AR 323). Plaintiff reported being very happy that his wife had decided to come back to him. He had no distortions in perception or judgment, though his impulse control was questionable in terms of his return to alcohol use. (AR 323-24). Dr. Campbell also recorded that Plaintiff experienced depression, was withdrawn and had feelings of helplessness, hopelessness, guilt and anger. (AR 326).

18

Dr. Campbell's principal diagnosis was alcohol abuse with a secondary diagnosis of depressive disorder. (AR 322). Dr. Campbell reported that Plaintiff only stayed in the program for three days (until April 18, 2003) but appeared to get some benefit from it. He was involved in therapeutic groups, he was involved in preparing his own treatment and discharge plans and he was referred to his general physician for continued medication. His discharge diagnoses were: Axis I: Depressive disorder, nos. alcohol abuse. Axis II: None. Axis III: cervical disc disease, status post amputation of foot. Axis IV: Moderate: Family stress. Axis V: Currently 30, past year 70. (AR 324). Plaintiff's treatment plan indicated short term goals that he set to deal with his alcohol abuse and dysphoric mood. (AR 331-36).

Dr. Campbell recorded a progress note on April 30, 2003 indicating that Plaintiff was suffering from neck spasms and was deteriorating. (AR 374). He claimed that Xanax helped, that he was mentally fine and that he had learned his lessons and no longer let things get to him. He claimed to be getting organized with his wife and was going to start counseling with Dr. Milgrim on the 14th. (AR 374). He also planned to pursue an accounting degree. (AR 374). Dr. Campbell assigned a GAF of 50 during this visit. (AR 374).

On May 8, 2003 Plaintiff was seen by Dr. Lotfi upon a referral from Dr. Warner for evaluation of his cervical spine. (AR 182-84). Dr. Lotfi noted that Plaintiff was having intermittent numbness and sometimes weakness in his right arm and right leg and occasional weakness in his face. (AR 182). Dr. Lotfi recorded that Plaintiff is currently disabled and not working but he is considering a return to work. (AR 182). Dr. Lotfi suggested obtaining x-rays of the cervical spine and possibly a MRI. (AR 183). Later that same day, Plaintiff went to the Potomac Hospital emergency room suffering from a lacerated finger from a table saw accident. (AR 308-20). The wound was stitched and Plaintiff was released. (AR 308-20).

On May 12, 2003 Plaintiff began seeing Steven Milgrim, LPC.  According to a letter from Mr. Milgrim dated July 3, 2004 (AR 383), Plaintiff saw Mr. Milgrim weekly beginning on May 12, 2003 for six weeks, at which time he indicated he could not afford to continue.  Mr. Milgrim says that Plaintiff was not employed at the time but was preparing to take classes to become an accountant.  Plaintiff felt down and hopeless at the time he stopped seeing Mr. Milgrim but planned to continue attending Alcoholics Anonymous meetings, taking his medication and seeing his psychiatrist as needed.  (AR 383).

On May 22, 2003 Plaintiff's cervical spine was x-rayed at Prince William Hospital.  (AR 179).  The radiology report states there is narrowing of the C4-5 space with moderate anterior osteophytes and no subluxation.  (AR 179).

Plaintiff returned for a monthly session with Dr. Campbell on May 31, 2003.  (AR 374).  Dr. Campbell's progress note indicates that Plaintiff still required daily Xanax but was generally pleasant.  (AR 374).  Plaintiff was given a GAF of 50 during this visit.  (AR 374).

On June 12, 2003 Plaintiff was seen by Dr. Lotfi after obtaining the suggested x-rays.  (AR 180-81).  The results of the x-rays were reviewed with the Plaintiff showing solid fusion at C5-C6 and incomplete fusion at C6-C7.  (AR 180).  There was no evidence of abnormal motion or instability.  (AR 180).  Dr. Lotfi's assessment was Plaintiff has subjective reports of right arm and leg intermittent weakness, with a completely normal exam.  His recommendation was a neurological referral with MRI studies to be considered depending on the results of the neurological referral.  (AR 180).

Plaintiff was seen by Dr. Naurang Gill for the first time on June 25, 2003, on referral from Dr. Lotfi and Dr. Warner, complaining of recurrent episodes of loss of consciousness.  (177-78, 340-41).  Plaintiff explained his cervical discectomy and previous seizure history.  He

told Dr. Gill that he was hospitalized for seizures in February 2003 and that he was put on Dilantin, but he never followed up with a neurologist. He explained that he has episodic right lower extremity numbness with a pins and needles-like sensation, then he suddenly loses strength and feels like passing out. (AR 340). Dr. Gill diagnosed Plaintiff with probable complex partial seizures with secondary generalization and recurrent paresthesias. He recommended Carbatrol, a MRI of the brain, an electroencephalogram and blood tests. (AR 341).

On July 1, 2003 Plaintiff had the MRI of his brain performed at MRI of Woodbridge. (AR 346). The results of the MRI were unremarkable and the impression was negative. (AR 346).

On July 21, 2003 Plaintiff was seen by Dr. Hsiao. (AR 528). The notes reflect a neurological assessment for stroke (Dr. Gill) and possibly an indication of Plaintiff beginning to study accounting. (AR 528).

Plaintiff returned to Potomac Hospital on August 4, 2003 for tests ordered by Dr. Gill. (AR 345, 347-52). Dr. Gill saw the Plaintiff on August 7, 2003 for a follow-up evaluation of his complex partial seizures. (AR 380). Dr. Gill noted that the MRI of Plaintiff's brain was unremarkable and his CBC was normal. Plaintiff complained of minor spells not progressing to full blown seizures. He claimed that his most recent seizure was in February or March of 2003. Dr. Gill prescribed Phenytek and recommended a CBC, hepatic panel and phenytoin level be performed in two weeks. He further advised Plaintiff to follow up with a psychiatrist and return in two months. (AR 380).

Plaintiff had his blood analyzed on September 5, 2003 (AR 344) and on September 25, 2003 (AR 343). Plaintiff returned to Dr. Gill on October 7, 2003 who noted that Plaintiff was doing much better than before despite complaining of episodic headache and inability to focus.

(AR 380). Plaintiff complained of pain in the right upper extremity and noticed some twitching in his eyes and feels like blanking out. He claimed that his right arm goes into a tonic phase followed by loss of consciousness for several minutes. (AR 380). Plaintiff then claims to feel confused and disoriented, which would last for several hours with difficulty walking. He claimed that his right leg would become numb pre-onset and he would lose control over his right arm and hand. He claimed that these spells were occurring on a daily basis. (AR 380). Plaintiff's phenytoin level was 3.3, which Dr. Gill noted was extremely sub-therapeutic, indicating noncompliance, poor absorption and/or rapid metabolism. (AR 380). Dr. Gill recommended Plaintiff continue on his course of Tranxene and Phenytek, have blood levels tested including hepatic panel and phenytoin level in four weeks and follow up in two months. (AR 380). Plaintiff did have a blood test for therapeutic drug monitoring performed on October 8, 2003. (AR 342).

Plaintiff was seen by Dr. Gill on November 18, 2003 on an emergency basis. (AR 373, 381). Plaintiff claims to have tripped and fell a few days prior and fractured his nose. He was treated at Fairfax Hospital Emergency Room and prescribed Percocet. The Percocet made him sick and he stopped taking it. A CT of Plaintiff's head was unremarkable but he complained of a pulsing sensation in his head, neck pain radiating into the right upper extremity and weakness of his right hand. (AR 373, 381). He complained of nocturnal paresthesias and difficulty opening jars and dropping things. He also complained of weakness on his right side and feeling like he may pass out. Plaintiff was taking Tranxene and Phenytek daily. (AR 373, 381). After examining Plaintiff, Dr. Gill recorded his impressions that Plaintiff's neurological exam is nonfocal except for the presence of Tinel's, Phalen's and reverse Phalen's signs at the carpal tunnels, right more than left. He noted mild weakness of the right APB muscle, dysesthesia over

22

the right forearm, upper arm and decreased pinprick sensation in the right median nerve distribution in the hand. Finally, he noted tenderness over the cervical spine with decreased range of motion. (AR 373, 381). Dr. Gill recorded his assessments that Plaintiff suffered from complex partial seizures with focal seizures with secondary generalization, rule out carpal tunnel syndrome, cervical spondylosis, rule out radiculopathy. He recommended changing Phenytek to Dilantin, continue Tranxene, an electroencephalogram, EMG/nerve conduction studies of upper extremities, Naprosyn and a follow up evaluation after those tests. (AR 373, 381).

On December 1, 2003 Plaintiff underwent a nerve study to rule out carpal tunnel syndrome. (AR 369-72). Dr. Gill found that Plaintiff had a significantly abnormal EMG/NCS, that was remarkable for bilateral carpal tunnel syndrome, right greater than left. (AR 369). He also found evidence of mild bilateral cubital canal syndrome, left greater than right, as well as distal sensory ulnar entrapments. He noted a needle exam was remarkable for right C-5 radiculopathy. (AR 369).

On February 17, 2004 Dr. Craig Fockler reported that Plaintiff had no new complaints, but needed refills of his prescriptions. (AR 366-67). Dr. Fockler examined Plaintiff and recorded his impressions that Plaintiff had a medical history of cervical diskectomy with chronic neck pain, seizure disorder and bilateral carpal tunnel syndrome. Dr. Fockler refilled Plaintiff's Tylenol 3 and Dilantin prescriptions and noted that he would obtain Plaintiff's past medical records. He also indicated that Plaintiff should continue using bilateral splints as needed for his carpal tunnel syndrome and instructed Plaintiff to return in three months. (AR 366).

On June 22, 2004 Dr. Fockler's progress notes indicate that Plaintiff called stating that Tylenol 3 was not helping his pain and asking if he would prescribe something stronger in advance of his appointment in July. It appears that this request was granted. (AR 395).

On July 21, 2004 Plaintiff was seen by Dr. Fockler. (AR 388-89, 394-95). Plaintiff had no new complaint other than that the Tylenol 3 was not helping his pain. He had no insurance and was filing for disability based on his daily seizures, for which he follows with his neurologist. Based on Plaintiff's complaints of pain, Dr. Fockler changed Plaintiff's pain medication to Vicoden. (AR 388, 394). With regard to Plaintiff's seizure disorder, Dr. Fockler stated that the Plaintiff will continue to follow with his neurologist and continue with his Dilantin and Xanax. Dr. Fockler noted that Plaintiff will follow up in three months and that his disability forms were filled out at that time. (AR 388, 394).

On July 28, 2004 Plaintiff had an analysis of the level of phenytoin done by Quest Diagnostics. (AR 511). A note on that report from Dr. Gill's office reveals that as a result of that test, Plaintiff's dosage of Dilantin was increased. (AR 511).

On August 13, 2004, Dr. Gill completed a Residual Functional Capacity Questionnaire in which he indicated that considering all of Plaintiff's symptoms, functional limitations and physical and psychological condition, it was his opinion that Plaintiff was incapable of any gainful employment. (AR 384-86, 513-15). Dr. Gill's diagnosis was that Plaintiff had cervical discectomy with fusion in February 2001, complex partial seizures with secondary paralysis, bilateral carpal tunnel syndrome, right C5 radiculopathy and depression/anxiety. (AR 384, 513). He found that Plaintiff could continuously sit for 10-30 minutes and stand for 10-15 minutes at any one time. (AR 386, 515). During an 8-hour workday, Plaintiff could sit for about 2 hours total and stand for about 2 hours total. (AR 386, 515). He could occasionally carry 10 pounds or less, but never carry 20 or 50 pounds. He could infrequently use either hand for grasping, but could use neither hand for pushing and pulling of controls or fine manipulation. (AR 386, 515). He could use either foot for pushing and pulling of leg controls. (AR 386, 515). Dr. Gill noted

that Plaintiff's primary neurological problem was complex partial seizures with frequent breakthrough seizures causing physical and mental/cognitive impairment which render him incapable of gainful employment. (AR 385, 514).

On November 18, 2004 Plaintiff returned to Dr. Fockler but indicated that it would most likely be his last visit to that office. (AR 393). Plaintiff had no new complaint and Dr. Fockler examined him and noted Plaintiff was in no acute distress. (AR 393). He reviewed Plaintiff's medications and noted that his Dilantin was recently increased to 100 mg. Dr. Fockler indicated that Plaintiff's current medical diagnoses were all stable, he would continue the current medical therapy and he refilled all medications, including Vicoden. Follow-up would occur in three months if Plaintiff had not found a new physician in Virginia by that time. (AR 393).

On March 2, 2005, Dr. Fockler's progress notes indicated that Plaintiff's son called, stating that it would be difficult to bring Plaintiff in for an appointment because he was in West Virginia, and asking if the doctor could call Plaintiff's medications into a pharmacy in lieu of an appointment. (AR 392). Dr. Fockler noted that he had discussed this issue with Plaintiff at his last visit and that he was concerned that Plaintiff might be getting meds from two sources. (AR 392).

On April 28, 2005 Plaintiff returned to Dr. Gill. (AR 510). Dr. Gill noted that Plaintiff failed to report for some tests including an EEG and MRI and a previous follow up visit because of lack of health insurance. Plaintiff complained of headaches, abnormal sensation in his left ear, right shoulder pain, pins and needles in his right foot and lower back pain on the right side. Dr. Gill indicated that Plaintiff was experiencing tenderness over his right shoulder with a decreased range of motion and Plaintiff complained of pain over 90 degrees of abduction. Plaintiff's right straight leg raising sign was positive, left was negative and his range of motion was at 80 degrees

of flexion at the lumbar spine. He also noted clinical evidence of carpal tunnel syndrome. (AR 510). Dr. Gill continued Plaintiff's prescriptions and ordered a phenytoin level test to determine if the dose of Dilantin should be adjusted. He recommended Plaintiff return in three months. (AR 510). The phenytoin level test was performed on May 6, 2005. (AR 509).

On September 15, 2005 Plaintiff was seen by Dr. Gill for a further evaluation. (AR 508). Plaintiff stated that he was suffering only minor episodes in the form of feeling imbalanced, diaphoretic and fluttering of the eyes, particularly when he is in a mall or a store. He reported no loss of consciousness. He did complain of right sided numbness and a numbness and coldness in his right upper extremity when he raises his arm above the shoulder and he feels like passing out. (AR 508). Dr. Gill's assessment was complex partial seizures, but doing well on Dilantin, bilateral carpal tunnel syndrome, tendonitis of the right shoulder and rule out thoracic outlet syndrome. He recommended chest and cervical spine x-rays, continued Dilantin and Tranxene and an additional evaluation in three months, or sooner if necessary. (AR 508).

On January 18, 2006 Plaintiff went to Potomac Hospital for chest and spinal x-rays. (AR 506). The report from the chest x-ray revealed that Plaintiff had no rib fracture or pneumothorax. The films from the cervical spine revealed straightening of the cervical lordosis, a prominent osteophyte at C4 and mild prominence of the prevertebral soft tissues, with no definite fracture identified. (AR 506). After his x-rays, but before the results were obtained, Plaintiff saw Dr. Gill for a follow-up evaluation. (AR 507). He denied any seizures but complained of occasional headaches, left frontal and temporal throbbing pain, along with a vibration feeling in the right groin. (AR 507). He complained of pain in his right shoulder and his carpal tunnel symptoms were active, right greater than left. Upon examination, Dr. Gill found tenderness along the cervical spine and right shoulder, with positive Tinel's and Phalen's

26

signs at the carpal tunnels and hypoesthesias in the median nerve distribution in the hands and mild weakness of the APB muscle. (AR 507). Dr. Gill continued Plaintiff's prescriptions pending the x-ray reports and recommended he return in two months.

On April 12, 2006 Plaintiff returned to Dr. Gill for a further evaluation of his complex partial seizures and bilateral carpal tunnel syndrome. (AR 505). He complained of vibration in his right groin for the past five months and aura or dazed feeling which does not grow into a full seizure. Plaintiff denied any major seizures since his last visit. He complained that he felt like he was having uncontrolled movement in the right upper extremity and of a fainting feeling when he looked up or raised his right arm. His carpal tunnel symptoms were more pronounced in the right than the left hand, and he still experienced paresthesias. (AR 505). Plaintiff had difficulty with fine test and coordination and he reported weakness of his hand grip. He stated that repetitive movements aggravated his symptoms. Dr. Gill noted that Tinel and Phalen signs were positive at the carpal tunnels, right greater than left and that there was decreased reflex sensation on the right median nerve distribution in the hand. He noted evidence of a left carotid bruit and an Adson test was questionably positive. Dr. Gill recommended a comprehensive metabolic panel, a carotid doppler study and chest x-rays. He increased Plaintiff's Tranxene prescription and suggested another evaluation in three months. (AR 505).

On July 12, 2006 Plaintiff was evaluated again by Dr. Gill. (AR 504). Plaintiff denied experiencing any full grown seizures since his last visit, but noticed occasional episodes of fatigue with "strange feelings" and then he goes to sleep. He had no loss of bowel or bladder control or any tonic-clonic activity. Plaintiff complained of poor eyesight in the left eye, particularly at night, but his vision was fine during the day. He also complained of neck and shoulder pain, numbness in both hands with tingling sensation, nocturnal paresthesias, difficulty

opening jars and cans and similar tasks and dropping items. (AR 504). Dr. Gill noted that there was significant tenderness along the cervical spine and pain on extension of the C-spine. Plaintiff exhibited positive Tinel and Phalen signs, right greater than left, and reverse Phalen signs were bilaterally negative. Plaintiff had decreased pinprick sensation in the right median nerve distribution greater than left and mild weakness of APB muscles, right greater than left. Plaintiff's reflexes were normal and he showed evidence of left carotid bruit as before. (AR 504). Dr. Gill again recommended a carotid doppler study along with wrist braces, continued Dilantin and Tranxene and another evaluation in three months or sooner. (AR 504).

On February 15, 2007 Plaintiff returned to Dr. Gill for a follow-up evaluation. (AR 519). Plaintiff complained of pain in his right hand radiating into his forearm and elbow and anxiety-like attacks. Dr. Gill noted that a carotid doppler study revealed mild atherosclerosis without any hemodynamically significant stenosis. Chest x-rays revealed mild pleural effusion. Plaintiff complained of frequent headaches, intermittent dizziness, bilateral hearing loss and pain on the right side of his chest. Plaintiff denied any seizure or syncope, but complained of numbness and bad feelings inside his body. (AR 519). Dr. Gill indicated that based upon his symptomology, the possibility of a breakthrough seizure could not be ruled out. (AR 519). He recommended that Plaintiff have an orthopedic consultation for carpal tunnel syndrome and to see his primary care physician for the chest pain. Pending Plaintiff's serum levels, Dr. Gill indicated that he would adjust Plaintiff's Dilantin level. He continued Plaintiff's Tranxene and recommended wrist braces and a further evaluation in three months. (AR 519).

On February 26, 2007 Dr. Anthony Hsiao completed a Physical Residual Functional Capacity Questionnaire on Plaintiff. (AR 516-18). He indicated that he had been seeing Plaintiff every three months for four years and that Plaintiff suffered from severe bilateral carpal

tunnel syndrome (diagnosed in 2004), chronic seizure disorder (diagnosed in 2000) and thoracic outlet syndrome and stated that his prognosis was poor. (AR 516).[1] Dr. Hsiao noted that Plaintiff suffered from depression and anxiety and that his pain constantly interfered with his attention and concentration. (AR 517). He indicated that in his opinion Plaintiff was incapable of even low stress jobs and that he would need sixteen rest periods of fifteen minutes during an eight hour work day. (AR 517). Dr. Hsiao reported that Plaintiff could sit for only fifteen minutes continuously, stand for zero to five minutes continuously and he could sit or stand for less than two hours each, total, in an eight hour work day. (AR 518). Dr. Hsiao stated that Plaintiff could never carry less than ten pounds, that he could not use either hand for simple grasping, pushing and pulling of controls or fine manipulation and he could not use either foot for pushing and pulling of leg controls. (AR 516-18).

On March 5, 2007 Dr. Gill completed another Physical Residual Functional Capacity Questionnaire on Plaintiff. (AR 520-22). He indicated that he had seen Plaintiff every three months beginning June 25, 2003 until his most recent visit on February 15, 2007. He diagnosed Plaintiff with epilepsy and carpal tunnel syndrome and indicated that Plaintiff would stay on epilepsy drugs for life. (AR 520). He noted that Plaintiff's depression and anxiety contributed to his physical condition at times and that his pain and other symptoms were often severe enough to interfere with his attention and concentration. (AR 521). He noted that Plaintiff was incapable of even low stress jobs. (AR 521). Dr. Gill indicated that Plaintiff could continuously sit for twenty minutes at a time and stand for ten to fifteen minutes at a time. (AR 522). He could sit and stand each for about two hours total in an eight hour workday, occasionally carry ten pounds

---

[1] The Administrative Record contains notes of visits with Dr. Hsiao on February 22 and 26, 2007, November 17, 2006, February 13, 2006, December 20, 2005, October 18, 2005, August 23, 2005, February 24, 2005 and July 21, 2003 that are for the most part illegible and therefore are not included in this analysis. (AR 524-28).

or less, but never carry twenty or fifty pounds. (AR 522). He could perform simple grasping with both hands, but he could not push and pull controls with either hand. He could use both of his feet for pushing and pulling of leg controls. Dr. Gill noted that in his opinion Plaintiff was incapable of any gainful employment, his disability was permanent and no further documentation was necessary. (AR 522).

**Evaluations of Plaintiff for Disability Determinations**

On November 26, 2003 Mary Ellen Cronin, Ph.D., a clinical psychologist, completed a psychiatric review form for Plaintiff's disability determination. (AR 353-57). Her assessment was affirmed as written by Marcia M. Grenall, Ph.D. on March 18, 2004. (AR 353). Ms. Cronin's report indicated that Plaintiff's impairment was not severe and that he suffered from the affective disorder of depression and substance abuse disorders. Ms. Cronin assessed that Plaintiff's limitations were mild with regard to restriction of daily living activities, difficulty in maintaining social functioning and difficulty in maintaining concentration, persistence or pace. (AR 355). She found that Plaintiff had no episodes of decompensation of extended duration. (AR 355). She noted that he was not being treated for psychiatric or psychological disorders, nor did he have any history of inpatient treatment for any such disorder. She commented that Plaintiff's mental status is within normal limits and, while she found the allegation of depression credible, she did not find it severe and Plaintiff did not meet/equal a listing. (AR 357).

On December 2, 2003 Dr. William Amos completed a Residual Functional Capacity Assessment of the Plaintiff for his disability determination. (AR 358-65). Dr. Amos listed as a primary diagnosis Plaintiff's back. (AR 358). He found that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) about 6 hours in an 8 hour workday, sit (with normal breaks) for a total of about 6 hours in an 8 hour

workday, push and/or pull (including operation of hand and/or foot controls) to an unlimited

degree, other than as shown for lift and/or carry. (AR 359). Dr. Amos noted Plaintiff's episodes

of loss of consciousness and cervical diskectomy with fusion, but stated that Plaintiff's motor

strength was normal, his gait was normal and he was neurologically intact. (AR 359). Dr. Amos

found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance,

stoop, kneel, crouch or crawl. (AR 360). He did not note any manipulative, visual or

communicative limitations and the only environmental limitation Dr. Amos listed was avoidance

of hazards – e.g. machinery, heights, etc., due to Plaintiff's history of seizures. (AR 360-62).

Dr. Amos concluded that Plaintiff's symptoms were credible, but were not severe enough to

meet the program criteria. (AR 363).

Dr. Amos' findings were affirmed as written by Dr. Luc Vinh on March 19, 2004,

although a note was added to the report based on Plaintiff's visit to Dr. Craig Fockler on

February 17, 2004. Additional comments reflected that Plaintiff was taking Tylenol for chronic

pain, that he has carpal tunnel syndrome and uses bilateral splints as needed. (AR 365). It was

also noted that Plaintiff is able to prepare simple meals, do light housekeeping, read and watch

television. The Plaintiff appears credible but he is capable of light work. (AR 365).

## PROCEEDINGS BEFORE THE ADMINISTRATIVE LAW JUDGE

### Initial Hearing before the Administrative Law Judge on August 17, 2004

On August 17, 2004 Plaintiff and his counsel appeared before ALJ Bond for a hearing on

his DIB and SSI claims. (AR 34-51). Plaintiff's counsel argued that due to musculoskeletal and

neurological impairments, Plaintiff was incapable of any substantial gainful activity. (AR 37).

Plaintiff testified that he last worked as an independent courier until he lost his vehicle and that

he had looked for another job in the classifieds, but was unable to find anything that he could do

31

physically. (AR 39). Plaintiff testified to his treatment for back pain, seizures and carpal tunnel syndrome. (AR 40-41). Plaintiff was questioned by his attorney and testified that even if he had not lost his car, he was going to have to give up his job as a courier because the loss of sensation on his right side made it difficult to drive. (AR 41). Plaintiff further testified that he lost a job working security at a camp because he repeatedly "passed out" at work. (AR 42).

A vocational expert, Adena Leviton, testified at the hearing. (AR 43-45, 49-50). The ALJ began the questioning of the vocational expert by posing a hypothetical individual who had the same age, education and work experience as Plaintiff and who had the capacity to do light work, unskilled, with a sit/stand option and limited general public contact. (AR 43-44). He then asked Ms. Leviton whether any jobs existed that such a person could perform on a sustained basis and if so, whether such jobs existed in significant numbers in the national economy. (AR 43-44). Ms. Leviton identified three examples of light, unskilled jobs and indicated their availability nationwide as well as within the local, Washington, D.C. metropolitan area. (AR 44). She testified that those jobs were consistent with the Dictionary of Occupational Titles, except for the sit/stand option, which was based upon her own experience. (AR 44). She testified that two of the jobs she identified could be performed sitting or standing at the worker's will and that the third job required the worker to stand for part of the day. (AR 44-45).

Plaintiff was examined by his attorney and described the episodes of paralysis that he encountered on the right side of his body. He claimed that these episodes can last from a few hours to a week and that during an episode he is unable to walk or use his right hand. (AR 46). He testified that he experienced these episodes at least three times a week and could never tell when they were going to occur. (AR 45-46). Plaintiff claimed that his last unconscious seizure occurred in April 2003. (AR 47). Plaintiff indicated that he used a cane to help him walk but

that he could not stand for more than five minutes or sit in a rigid chair. (AR 47-48). He testified that the pain radiated from his cervical spine down through his right shoulder, through his arm to the tips of his fingers, which he believed resulted from a combination of radiculopathy and carpal tunnel syndrome. (AR 48). Plaintiff indicated that Dr. Gill, his neurologist, suggested that he see an orthopedic doctor, but that he could not afford one and he did not have any insurance. (AR 48-49).

Plaintiff's attorney then asked Ms. Leviton to add to the ALJ's hypothetical individual unpredictable episodes of paralysis on the right side of the body occurring two to three times a week and lasting a few hours at a time. (AR 49). Ms. Leviton indicated that there would be no work available for such an individual. (AR 49). Ms. Leviton also stated that if a person lost complete use of one hand during the workday, that person would not be able to perform the three jobs she had identified. (AR 50). Plaintiff's counsel concluded that Dr. Gill's opinion should be given great evidentiary weight, that Plaintiff's testimony should be found credible and that Plaintiff's impairments could reasonably cause his limitations. (AR 50-51).

**Administrative Law Judge Bond's Initial Decision[2]**

On October 28, 2004 ALJ Bond issued a decision denying Plaintiff's claims. (AR 71-79). He found that Plaintiff's allegations regarding his limitations were not totally credible. Based upon his review of the record, he concluded that the Plaintiff had the residual functional capacity for unskilled light work, with a sit/stand option and limited general public contact. Since Plaintiff's past relevant work as a computer operator did not require the performance of

---

[2] A detailed analysis of the conclusions of law from the two initial decisions by the ALJ would serve no useful purpose since the issue before the Court involves the conclusions contained in final decision of the Commissioner as reflected in the decision issued on April 25, 2007. The final decision does, however, incorporate the factual discussion from the two earlier decisions. (AR 417, 419).

work-related activities precluded by his residual functional capacity, the ALJ found that Plaintiff's medically determinable back disorder and seizures did not prevent the Plaintiff from performing his past relevant work. The ALJ also stated that the testimony showed that even if the Plaintiff could not perform his past relevant work, he would still be capable of performing other jobs existing in significant numbers in the national economy. (AR 78-79).

Plaintiff requested review of that decision and the Appeals Council directed ALJ Bond to obtain additional evidence on Plaintiff's mental impairment, further evaluate Plaintiff's subjective complaints, evaluate Plaintiff's mental impairment in accordance with 20 C.F.R. 404.1520a and 416.920a, give further consideration to Plaintiff's maximum residual functional capacity and obtain supplemental evidence from a vocational expert to clarify the demands of past relevant work and/or the effect of the assessed limitations on the Plaintiff's occupational base. (AR 108-09).

**Second Hearing before the Administrative Law Judge on May 19, 2005**

At the direction of the Appeals Council, ALJ Bond obtained additional evidence and held another hearing on May 19, 2005. (AR 52-68). Plaintiff appeared with counsel and testified. Plaintiff's counsel argued that Plaintiff continued to suffer from periodic complex partial seizures resulting in loss of consciousness, as well as carpal tunnel syndrome and psychiatric problems. He also suffered from hearing loss. (AR 54-55). Plaintiff testified regarding what activities he was able to perform on a regular basis. (AR 57-58). Plaintiff stated that he took medication for his seizure disorder but that it really made no difference and that he suffered a seizure in late April or early May of 2005. (AR 58, 62). He testified that he has carpal tunnel syndrome in both hands. (AR 59). Plaintiff claimed to experience pain radiating from the base of his skull down his neck, across his right shoulder, down his back all the way down to his right

34

foot and that the pain medication he was taking made no difference. (AR 59, 62-63). He testified that he had trouble using his right hand for anything and that use of his left hand was limited by the carpal tunnel syndrome but that he could lift a gallon of milk with his left hand. (AR 60-61). He claimed not to have trouble sitting for prolonged periods of time unless it was in a rigid seat. (AR 61). But in an office setting he would be very uncomfortable and would have to get up and move around after fifteen to twenty minutes. (AR 61). Plaintiff stated that he could stand or walk for no more than five minutes. (AR 61).

A vocational expert, Tanya Hubacker, testified after Plaintiff. The ALJ posed a hypothetical individual to Ms. Hubacker who had the same age, education and work experience as Plaintiff, and who had the capacity to do sedentary work, unskilled, with a sit/stand option and limited dominant hand usage. He asked Ms. Hubacker whether any jobs existed that such a person could perform on a sustained basis, and if so, whether such jobs existed in significant numbers in the national economy. (AR 63-65). Ms. Hubacker identified three examples of sedentary, unskilled jobs with those limitations and indicated their availability nationwide as well as within the local, Washington, D.C. metropolitan area. (AR 65). The ALJ then asked if any light, unskilled jobs existed with the same limitations. Ms. Hubacker identified three examples of light, unskilled jobs and indicated their availability both nationwide and in the Washington, D.C. area. (AR 65). She testified that those jobs were consistent with the Dictionary of Occupational Titles, except for the sit/stand option, which was based upon her own experience. (AR 66).

Mr. Mathis asked Ms. Hubacker if her answer would change if the additional limitation of a seizure disorder were added to the hypothetical, which would cause a person to lose consciousness at unpredictable intervals for up to two hours at a time. (AR 66). Ms. Hubacker

testified that if such a condition occurred during work hours, then work would be eliminated for such an individual. (AR 66). Plaintiff's counsel concluded with a statement that the evidence established that Plaintiff was unable to engage in substantial gainful activity. (AR 67). The hearing was then concluded.

## Administrative Law Judge Bond's Second Decision

On June 27, 2005 ALJ Bond denied Plaintiff's claims. (AR 17-29). After consideration of additional evidence and testimony, he found that Plaintiff was not disabled within the meaning of the Act. (AR 29). The ALJ found that Plaintiff's allegations regarding his limitations were not totally credible. The ALJ determined that the Plaintiff retains a residual functional capacity to perform less than the full range of light unskilled work or in the alternative less than the full range of sedentary unskilled work. The ALJ concluded that Plaintiff was unable to perform any of his past relevant work but that there are a significant number of jobs in the national economy that he could perform and therefore he is not disabled under the Act. (AR 28-29).

Plaintiff requested review of this second decision as well, but the Appeals Council denied his request for review. (AR 12-14). Plaintiff then filed a Complaint in this Court. (AR 451-52). Upon the Commissioner's motion, the case was remanded to the Appeals Council. The Appeals Council vacated the June 27, 2005 decision and directed that a new ALJ obtain updated evidence from the Plaintiff's treating physician concerning the severity of his seizure disorder and whether it is controlled with medication. The new ALJ was also ordered to evaluate further Plaintiff's subjective complaints and mental impairment, to give further consideration to Plaintiff's maximum residual functional capacity and to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the Plaintiff's occupational base. (AR 454-56).

36

**Hearing before Administrative Law Judge Sturek on March 8, 2007**

At the direction of the Appeals Council, Plaintiff's case was reassigned to ALJ Sturek. On December 7, 2006 ALJ Sturek sent a letter to Plaintiff's counsel requesting an additional statement from Plaintiff's treating physician regarding whether his seizure disorder was controlled with medication. (AR 478). Dr. Gill examined Plaintiff again on February 15, 2007 (AR 519) and completed another Physical Residual Functional Capacity Questionnaire on March 5, 2007. (AR 520-22). Dr. Hsiao also completed a Physical Residual Functional Capacity Questionnaire on February 26, 2007. (AR 516-18). Neither doctor indicated directly whether Plaintiff's seizures were controlled by his medication. Dr. Gill did report that Plaintiff denies any syncope or seizure. (AR 519). However, he noted that Plaintiff "complains of numbness and bad feelings inside his body with feeling dizziness and nauseated without loss of consciousness and such episodes last from one to one and a half hour; however, the patient is a very historian." (AR 519). Dr. Gill also commented that based on Plaintiff's symptomology, "the possibility of a breakthrough seizure could not be ruled out." (AR 519). His questionnaire indicated that Plaintiff would be on epilepsy drugs for life. (AR 520). Dr. Hsiao indicated that Plaintiff suffered from chronic seizure disorder and listed one of his symptoms as "seizures (grand mal)." (AR 516). He also indicated that Plaintiff was prescribed 200 mg. of Dilantin three times a day for seizure control. (AR 516).

ALJ Sturek conducted another hearing on March 8, 2007. (AR 568-621). Mr. Mathis argued initially to ALJ Sturek that Plaintiff suffered from a combination of impairments that rendered him unable to work. He asserted that not only did Plaintiff's epilepsy meet the listing at 11.03 (20 C.F.R. Pt. 404, Subpt. P, App. 1) but his cervical discectomy, seizure disorder, bilateral carpal tunnel syndrome and depression, combined, also render him disabled. (AR 571-

72). Plaintiff testified as to his living conditions and his daily activities. He stated that he drove a car approximately three times a week to run errands despite his seizure disorder, because he could usually feel them coming on. (AR 575-76). Plaintiff also testified regarding his education and previous work experience, including his service in the military. He testified that he was discharged from the Army after one year of service because of a bone infection and that he had not applied for benefits with the Veteran's Administration. (AR 577-78). Plaintiff claimed that he received unemployment benefits after his employment was terminated in 2001, for which he had to indicate that he was ready, willing and able to work, although not doing anything physically demanding. (AR 579).

A vocational expert, Leonard Perlman, testified regarding the exertional and skill level of Plaintiff's past employment. He classified each job on a scale from sedentary to medium exertional level and from unskilled to skilled and testified as to the transferability of those skills. (AR 582-83). The ALJ then examined Plaintiff regarding his various conditions. Plaintiff testified that he had his first seizure in 2002 and that he experienced numbness and paralysis when he felt them coming on. (AR 584). His last full blown seizure was in 2004 but he still experienced minor seizures that last from two to six hours. (AR 585-86). He testified that he was diagnosed with carpal tunnel syndrome by Dr. Gill, his neurologist, and that he had a hearing problem for many years. (AR 587-88). The ALJ questioned Plaintiff about an incident in 2003 when Plaintiff injured his hand while using a table saw. Plaintiff indicated that he used the saw despite having an unpredictable seizure disorder and not having any strength in his right hand and in fact he said he still used it on occasion. (AR 588-89, 591-93, 609-10).

Plaintiff testified that he experienced constant pain in his right shoulder, arm and hand for which he took medication. He said the pain medication did not completely relieve the pain, but

38

did help somewhat. He stated that he did not use pain medication that day or the day before, and that the last time he used pain medication was the day prior. (AR 589-90). He claimed to take seizure medication every day as well as medication to keep him from shaking in the right arm and hand. Plaintiff denied being right handed, and claimed that he did not have problems using his left hand, other than carpal tunnel syndrome. He said that surgery on his hands had been recommended, especially the right hand, but that he could not afford it. (AR 590-91).

Plaintiff testified that he had trouble walking due to the loss of two of his toes in 1982, and that he had to use a cane. He claimed he could only stand for a very few minutes, though he had had to stand for more than a few minutes on the metro that morning. (AR 594-95). He testified as to certain movements he could and could not make, and everyday tasks that he could and could not perform. (AR 595-600). Plaintiff claimed that he had just been diagnosed with a blockage of blood vessels on the right side of his neck but had been given nothing to treat it. (AR 596). He admitted to smoking about half a pack of cigarettes a day. (AR 600-01). Plaintiff further testified about his everyday activities, including using a riding lawnmower and shoveling snow. (AR 602-05, 607-609). He claimed that he had ceased drinking alcohol about two years before. (AR 605). Mr. Mathis then examined the Plaintiff concerning his depression and anxiety. (AR 610-12).

The vocational expert was recalled and the ALJ posed a hypothetical individual who had the ability to lift ten pounds frequently, twenty pounds on occasion, but with a limited ability to push and pull with the dominant upper extremity. The ALJ asked Mr. Perlman if such a person could perform light work. Mr. Perlman testified that such an individual could perform some light work, but not a full range. He could, however, perform a full range of sedentary work. (AR 614). The ALJ then described an individual with those exertional limitations as well as with

Plaintiff's non-exertional limitations (AR 615) and asked Mr. Perlman what percentage of light

unskilled and sedentary unskilled jobs such a person could perform. Mr. Perlman indicated that

such an individual could perform eight percent of the light jobs and about fourteen percent of

sedentary jobs. (AR 614-16). The ALJ asked Mr. Perlman to identify examples of jobs

consistent with the described exertion and skill levels, and how many are available in the

national economy as well as locally. (AR 616). Mr. Perlman identified two examples of light,

unskilled jobs (office helper and stock checker) and two examples of sedentary, unskilled jobs

(surveillance system monitor and order clerk) and indicated their availability nationwide as well

as within the local, Washington, D.C. metropolitan area. (AR 616-17). He also indicated that

there were no semi-skilled light or sedentary jobs that could be performed by someone with

Plaintiff's limitations. (AR 617).

Finally, the ALJ asked Mr. Perlman to examine Dr. Gill's Residual Functional Capacity

Questionnaire from August 13, 2004, and what work would be suitable for someone with the

limitations indicated. Mr. Perlman stated that he could recommend no work for such an

individual. (AR 618). Mr. Perlman also reviewed Dr. Hsiao's Residual Functional Capacity

Questionnaire and indicated that an individual with the limitations described therein was

incapable of working. (AR 618-19). Mr. Perlman stated that if Plaintiff's testimony was given

full credibility, there was no work that Plaintiff could perform on a full-time basis. (AR 619-20).

In closing, Plaintiff's counsel appealed to the ALJ to give Plaintiff's testimony full credibility

and to consider all the evidence in the record supporting Plaintiff's claims. (AR 620-21).

**Decision of Administrative Law Judge Sturek**

On April 25, 2007 ALJ Sturek issued his decision denying Plaintiff's claims. (AR 411-

25). After consideration of additional evidence and testimony, he found that Plaintiff was not

disabled within the meaning of the Act. (AR 425). Specifically, ALJ Sturek made the following findings: (1) Plaintiff meets the non-disability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act through March 30, 2007; (2) Plaintiff has not engaged in substantial gainful activity since August 22, 2001 (20 C.F.R. §§ 404.1520(b), 416.920(b)); (3) Plaintiff has the following severe impairments: a seizure disorder, bilateral carpal tunnel syndrome, residuals of laceration of right middle finger, cervical disc disease with radiculopathy, hearing loss, depression (mental impairment) and a history of alcohol abuse (20 C.F.R. §§ 404.1520(c), 416.920(c)); (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R. §§ 404.1520(d), 416.920(d)); (5) Plaintiff retains the residual functional capacity to perform the full range of sedentary exertional work activities and a significant range of light exertional work activities. Plaintiff can lift 10 pounds frequently and 20 pounds occasionally, but cannot use push/pull controls with the dominant upper extremity at above 10 pounds of force. He can occasionally climb stairs or ramps, occasionally balance, bend, stoop, kneel, crouch or squat, but can never crawl. He has limited dominant hand use, including limitations in overhead reaching and in feeling. Plaintiff has limited ability in hearing and should avoid concentrated exposure to noise. He should also avoid concentrated exposure to workplace hazards. Plaintiff has a moderate limitation in the ability to concentrate, maintain attention for extended periods and keep up a pace, due to pain, fatigue, side effects of medication and emotional factors; (6) Plaintiff does not retain the capacity to perform past relevant work (20 C.F.R. §§ 404.1565, 416.965); (7) Plaintiff was born in 1958 and was 43 years old on the alleged disability onset date, which is defined as a younger individual (age 18-44) (20 C.F.R. §§ 404.1563, 416.963); (8) Plaintiff has at least a high school

education and is able to communicate in English (20 C.F.R. §§ 404.1564, 416.964); (9) The

Plaintiff does have transferable skills (20 C.F.R. §§ 404.1568, 416.968); (10) Considering the

Plaintiff's age, education, work experience and residual functional capacity, there are jobs that

exist in significant number in the national economy that the Plaintiff can perform (20 C.F.R. §§

404.1560(c), 404.1566, 416.960(c) and 416.966); and (11) Plaintiff has not been under a

"disability" as defined in the Social Security Act, from August 22, 2001 through the date of this

decision (20 C.F.R. §§ 404.1520(g), 416.920).  (AR 414-25).

    Plaintiff filed Exceptions to Administrative Law Judge Denial Decision in May 2007.

(AR 403-10).  On December 22, 2007 the Appeals Council declined to assume jurisdiction,

rendering the ALJ's decision the final decision of the Commissioner of Social Security.  (AR

396-98).

## DISCUSSION

    Disability is defined in the Act as "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months...."  42 U.S.C. § 423(d)(1)(A).  Further, an individual is deemed to have a

disability only when the individual's

> physical or mental impairment or impairments are of such severity that he is not
> only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  In addition, a "physical or mental impairment is an impairment that

results from anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

42

**Standard of Review and Applicable Legal Standards**

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence and whether the proper legal standards were applied in evaluating the evidence. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'" *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (*quoting Craig*, 76 F.3d at 589). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a plaintiff's work and medical history is required in order to determine if a plaintiff is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a Court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the plaintiff was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a plaintiff's work constitutes SGA, the analysis ends and the plaintiff must be found "not disabled," regardless of any medical condition. *Id.*  If the plaintiff establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function.  20 C.F.R. § 404.1520(c).  At the third step, if the plaintiff has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the plaintiff can return to his past relevant work[4] based on a complete assessment of the plaintiff's residual functional capacity

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).

[4] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

("RFC")[5] and the "physical and mental demands of work [the plaintiff] has done in the past." 20

C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be

awarded. *Id.* However, if the plaintiff cannot perform his past relevant work, the burden shifts

to the Commissioner at the fifth step to show that, considering the plaintiff's age, education,

work experience and residual functional capacity, the plaintiff is capable of performing other

work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f),

404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen v. Yuckert*, 482

U.S. 137, 146, n.5 (1987)); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The

Commissioner can carry the burden in the final step with the testimony of a vocational expert.

When a vocational expert is called to testify, the ALJ's function is to pose hypothetical questions

that accurately represent the plaintiff's residual functional capacity based on all evidence on

record and a fair description of all the plaintiff's impairments so that the vocational expert can

offer testimony about any jobs existing in the national economy that the plaintiff can perform.

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents

*all* of the plaintiff's substantiated impairments will the testimony of the vocational expert be

"relevant or helpful." *Id.* If the ALJ finds that the plaintiff is not capable of substantial gainful

activity, then the plaintiff is found to be disabled and is accordingly entitled to benefits. 20

C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

[5] Residual functional capacity is defined as "an assessment of an individual's ability to do
sustained work-related physical and mental activities in a work setting on a regular and
continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week or an
equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the
adjudicator must discuss the individual's ability to perform sustained work activities in an
ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week or an
equivalent work schedule), and describe the maximum amount of each work-related activity the
individual can perform based on the evidence available in the case record. *Id.*

## ANALYSIS

**Arguments Presented in the Motions for Summary Judgment**

Plaintiff first challenges the ALJ's decision claiming that his treating physicians' opinions of disability and their descriptions of his impairments were rejected improperly and that his work related limitations were not evaluated in accordance with the standards set out in the applicable regulations. (Docket no. 21, Plaintiff's Mem. in Support of Motion for Summary Judgment, pg. 2, 17-24). Plaintiff argues that the ALJ failed to give the assessments of Plaintiff's ability to work from his treating physicians (Dr. Gill and Dr. Hsaio) the consideration required by 20 C.F.R. § 404.1527. (*Id.* at 18-22). Plaintiff claims that there is nothing in the Administrative Record to support the ALJ's determination that Plaintiff's seizures are controlled with medication at therapeutic levels. (*Id.* at 19). Plaintiff also argues that the ALJ ignored the treating physician's conclusions that Plaintiff's carpal tunnel syndrome limited Plaintiff to infrequent grasping of both hands and that he is limited to lifting only 10 pounds occasionally. (*Id.* at 19-20). Plaintiff contends that contrary to the ALJ's decision, there is evidence in the record to support the sitting and walking limitations noted by Dr. Gill. (*Id.* at 20). Plaintiff also states that the ALJ failed to consider whether Plaintiff's thoracic outlet syndrome is a severe impairment (*Id.* at 22) and Plaintiff questions whether the ALJ determined Plaintiff's credibility in a proper manner (*Id.* at 23-24).

Plaintiff also challenges the sufficiency of the vocational evidence. Plaintiff argues that the vocational evidence upon which the decision is based omits consideration of Plaintiff's limitations as set out in the record. (*Id.* at 2, 24-25). Plaintiff argues that the vocational expert testimony did not include the real limitations of Plaintiff's seizure disorder, cognitive problems,

his thoracic outlet syndrome, his left hand carpel tunnel syndrome and his restricted ability to stand and walk. (*Id.* at 24-25).

Defendant argues that the ALJ properly applied the five-step sequential analysis to determine if Plaintiff was disabled within the meaning of the Act and that there is substantial evidence in the record to support the ALJ's decision that the Plaintiff is able to perform jobs that exist in significant numbers in the national economy. (Docket no. 17, Mem. in Support of Defendant's Motion for Summary Judgment, pg. 15-26).

**The ALJ Applied the Proper Legal Standards**

A review of the final decision reveals that the ALJ evaluated Plaintiff's applications using the required five-step sequential analysis. (AR 414-25). First, he found that Plaintiff was not engaged in substantial gainful activity. (AR 417). Next, he found that Plaintiff had several severe impairments, including seizure disorder, bilateral carpal tunnel syndrome, cervical disc disease with radiculopathy, hearing loss and depression. (AR 417).[6] Third, he found that Plaintiff's impairments, or any combination of those impairments, did not meet or medically equal any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R. §§ 404.1520(d), 416.920(d)). (AR 418).[7] Fourth, the ALJ found that Plaintiff's residual functional capacity was sufficient for him to perform a full range of sedentary exertional work and a significant range of light exertional work (AR 419), but that he was unable to

_____

[6] The ALJ explained his finding that Plaintiff does have a severe mental impairment and, in accordance with the remand order from the Appeals Council, he addressed the Special Technique for Evaluating Mental Impairments in 20 C.F.R. §§ 404.1520a and 416.921a. (AR 417-19).

[7] At the hearing on March 8, 2007 Plaintiff argued that his seizure disorder met the listing at 11.03 based on the records from Dr. Gill indicating that Plaintiff reported having non-convulsive, petit mal-type seizures two or three times a week. (AR 571-72). Plaintiff has not challenged the ALJ's decision on this third step in his motion for summary judgment and as discussed below, the credible evidence in the Administrative Record does not support the claim that Plaintiff has seizures two or three times a week.

perform his past relevant work. (AR 422). Finally, the ALJ found that taking into consideration Plaintiff's age, education, work experience and residual functional capacity, there are jobs in the national economy that the Plaintiff can perform. (AR 423).

Plaintiff acknowledges that the ALJ did follow the required five-step process but disputes that there is sufficient evidence to support the ALJ's findings surrounding Plaintiff's residual functional capacity to perform either a full range of sedentary exertional work or a significant range of light exertional work. Plaintiff argues that taking into consideration his actual residual functional capacity, he would not be able to perform other work that is available in significant numbers in the national economy.

**The ALJ properly analyzed the treating physicians' opinions of disability and descriptions of Plaintiff's impairments and properly evaluated Plaintiff's work-related limitations**

As shown in the decision, the ALJ considered the medical opinion evidence in the Administrative Record and provided the reasons for the weight given to those opinions. (AR 419-22). Treating source opinions are to be given controlling weight if "well-supported by medically acceptable and clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527, 416.927. "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. If a treating source's opinion is not given controlling weight, the ALJ must consider the following factors in determining the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. §§ 404.1527, 416.927. The ALJ specifically acknowledged those requirements in his discussion concerning the weight to be afforded to the opinions contained in

48

the Residual Functional Capacity Questionnaires completed by Dr. Gill and Dr. Hsiao and he evaluated those opinions in accordance with those requirements. (AR 417, 421).

**Dr. Gill's opinions**

The ALJ noted Dr. Gill's specialization in neurology and that Dr. Gill was Plaintiff's treating neurologist since 2003. (AR 420-22). The ALJ cited to various medical records and reports from Dr. Gill throughout the decision, showing that those records were reviewed and considered by the ALJ. (AR 417, 419-22).

As required by the regulations, the ALJ analyzed the support in the Administrative Record for Dr. Gill's opinions. He addressed Dr. Gill's assessment in the August 2004 Residual Functional Capacity Questionnaire that Plaintiff suffered from "frequent breakthrough seizures," but noted that Dr. Gill did not discuss the difference between episodes that occurred when Plaintiff's medications were at therapeutic versus sub-therapeutic levels. (AR 514, 421). Pursuant to the remand order from the Appeals Council, the ALJ specifically requested a statement from Plaintiff's treating physician concerning whether Plaintiff's seizure disorder is controlled with medication. (AR 478). The report received from Dr. Gill dated February 15, 2007 indicated that Plaintiff was on seizure control medication (Dilantin and Tranxene) and that he denied any syncope or seizure. (AR 519). However, it did state that Plaintiff has "anxiety-like attacks" and that he complains of numbness and bad feelings inside his body with feeling dizziness and nauseated without loss of consciousness with such episodes lasting from one to one and a half hours but that Plaintiff "is a very historian." (AR 519). The neurological examination revealed clinical evidence of bilateral carpal tunnel syndrome and "based on patient's symptomatology, the possibility of a breakthrough seizure cannot be ruled out." (AR 519).

49

The ALJ acknowledged that the Plaintiff has a seizure disorder but noted that the recorded bouts of seizure activity had been associated with alcohol withdrawal and sub-therapeutic levels of his anti-seizure medication and that with good Dilantin levels, Plaintiff denied any syncope or seizures. (AR 420). The ALJ also noted the inconsistent testimony from the Plaintiff concerning how often he had seizures and the reports of seizure activity contained in Dr. Gill's records. (AR 420-21). The ALJ therefore concluded that while Dr. Gill's records supported a finding that Plaintiff experienced some seizures, though not as frequently as Dr. Gill concluded, the records did not support the conclusion that Plaintiff's medication was ineffective at preventing them. (AR 421). The ALJ's finding on this issue is supported by substantial evidence in the Administrative Record.

The ALJ found nothing in Dr. Gill's records to support the conclusion that Plaintiff was capable of sitting for only 30 minutes or less at a time for a total of about 2 hours in an 8 hour day. (AR 421). The ALJ noted that Plaintiff's orthopedic problems pertain to his neck and arms and even the Plaintiff never made a claim that he could only sit for less than 30 minutes at a time. (AR 421). Plaintiff testified during the hearing on March 8, 2007 that he sits while watching television and reading and that he watches television four or five hours a day and reads three or four hours a day. (AR 600, 603). The ALJ commented that such unsupported findings lessened his confidence in Dr. Gill's opinions, despite Dr. Gill's neurological specialization and ongoing treatment of Plaintiff. (AR 421-22).

In the Residual Functional Capacity Questionnaire completed by Dr. Gill in August 2004 he noted that Plaintiff's pain and symptoms would interfere frequently with his concentration and attention. (AR 514). In his March 2007 Questionnaire, Dr. Gill stated that Plaintiff's pain and symptoms would interfere often with his concentration and attention. (AR 521). Dr. Gill's

opinion as to this limitation was consistent with the ALJ's finding that Plaintiff had a moderate limitation in the ability to concentrate, maintain attention for extended periods and keep up a pace in a work setting. (AR 421).

Dr. Gill also noted in his March 2007 evaluation that Plaintiff could occasionally carry up to ten pounds and that Plaintiff could occasionally use both his right and left hand for simple grasping. (AR 522). Dr. Gill stated that Plaintiff could not use either hand for pushing or pulling of controls and could never lift twenty pounds or more in a competitive work situation. (AR 522). Dr. Gill based this limitation on Plaintiff's carpal tunnel syndrome which is described as "active" in his medical notes and not categorized as severe. Dr. Gill's medical records do not reflect any testing of Plaintiff's ability to carry items in excess of ten pounds or discussions with the Plaintiff concerning that limitation.

Dr. Gill did not include thoracic outlet syndrome in his diagnosis of the Plaintiff. (AR 520-22). In his September 15, 2005 note, Dr. Gill states under assessment "rule out thoracic outlet syndrome." (AR 508). His records following that examination do not reveal any diagnosis of thoracic outlet syndrome but do indicate "Adson test is questionably positive." (AR 505). The ALJ also did not find thoracic outlet syndrome to be one of Plaintiff's severe impairments. While Plaintiff complains that this condition is not addressed in the decision, the evidence of thoracic outlet syndrome in the record is sparse. (AR 505, 508, 516, 525). Furthermore, to the extent any symptoms associated with thoracic outlet syndrome needed to be addressed in Plaintiff's functional limitations, they have been so addressed by the ALJ.[8]

---

[8] As Plaintiff acknowledges, the symptoms most commonly associated with thoracic outlet syndrome are pain and paresthesias in the hand, neck, shoulder, arms and chest, which with the exception of the chest, are all symptoms Plaintiff complains of and were also consistent with Plaintiff's diagnosis of carpal tunnel syndrome and cervical disk disease with radiculopathy. (Plaintiff's Mem. in Support of Motion for Summary Judgment, pg. 2, n.2).

**Dr. Hsiao's opinions**

The ALJ also made reference to Dr. Hsiao's Residual Functional Capacity Questionnaire, in which Dr. Hsiao indicated that his relationship as Plaintiff's internal medicine physician began in 2001 and that he had seen Plaintiff every three months for 4 years.  (AR 422, 516).[9]

The ALJ reviewed Dr. Hsiao's assessment that Plaintiff could sit for only fifteen minutes at a time and stand or walk for five minutes at a time (for less than a total of two hours in an eight hour day for each activity), which he noted would place the Plaintiff in a prone position twelve out of every twenty-four hours.  (AR 422, 518).  He also addressed Dr. Hsiao's contention that Plaintiff could never lift any weight at all and claimed that such a finding is not supported by Dr. Hsiao's records, nor would it be an expected result from Plaintiff's carpal tunnel syndrome or C-5 radiculopathy.  (AR 422, 518).  The ALJ similarly cast doubt upon Dr. Hsiao's analysis related to Plaintiff's grip problems; while the evidence suggested that Plaintiff occasionally dropped items, there was no evidence that he dropped every item he picked up. Plaintiff himself did not allege such extreme limitations.  (AR 422, 516-18, 604-05).  The ALJ noted that Plaintiff's own testimony indicated that he was able to hold a pen and write with it, use a cane, prepare simple meals and do some light housework.  (AR 422 n. 27, 598-600). Contrary to the assessment by Dr. Hsiao, Plaintiff testified that he could lift a gallon of milk with his left hand.  (AR 61).  Plaintiff also testified that he could sit for extended periods of time and that he did not sleep during the day.  (AR 598, 603).

The ALJ evaluated Dr. Hsiao's opinion in light of its consistency with the clinical evidence, the opinion of Dr. Gill and the Plaintiff's testimony and found Dr. Hsiao's opinion was

---

[9] The notes in the Administrative Record from Dr. Hsiao reveal that he examined the Plaintiff on February 22 and 26, 2007, November 17, 2006, June 9, 2006, December 20, 2005, October 18, 2005, August 23, 2005, February 24, 2005, July 21, 2003 and January 17, 2003.  (AR 523-29).

not supported by his treatment notes or the other evidence in the Administrative Record. (AR 422). As a result, the ALJ properly determined that Dr. Hsiao's opinion was entitled to little weight. (AR 422).

### Credibility Determination

The ALJ noted that the credibility of the Plaintiff's statements regarding pain and seizure activity plays an important part in assessing not only the Plaintiff's testimony but also the weight to be given to medical source opinions because those medical professionals must to some degree rely on the recitation of symptoms stated by the Plaintiff. (AR 421). To the degree that an opinion is based on stated facts that may not be accurate, the opinion itself may not be accurate. (AR 421).

In evaluating a Plaintiff's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record"). If an underlying impairment reasonably could be expected to produce the individual's pain or other symptom, then the second part of the analysis requires the ALJ to evaluate a Plaintiff's statements about the intensity and persistence of the pain or other symptom and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the Plaintiff's statements regarding the extent of the symptoms and the ALJ must provide

specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id*. (*quoting NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id*. (*quoting NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations concerning his symptoms are not conclusive evidence that he is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ reviewed Plaintiff's claims that he has multiple seizures each week, that he loses consciousness frequently and unpredictably, that he has right-sided paralysis frequently and he has constant pain in his arms, hips, back and head and found that the medically-determined impairments could be reasonably expected to produce some degree of the alleged symptoms. (AR 419). The clinical evidence demonstrating carpal tunnel syndrome and C-5 radiculopathy supports a finding that Plaintiff has limited dominant hand use, including limitations in overhead reaching and in feeling and a restriction that Plaintiff is unable to crawl or use push/pull controls

54

with his dominant upper extremity at above 10 pounds. (AR 419). The cervical discectomy and fusion in 2001 with continued nerve root compression and the C-5 radiculopathy supports the claim of continuous pain requiring the use of pain-killing medication. (AR 420). As a result, Plaintiff has only a moderate ability to concentrate, maintain attention for extended periods of time and keep up a pace due to pain, fatigue, side effects of medication and emotional factors.

After reviewing Plaintiff's various statements to his treating physicians concerning his seizure activity, the results of tests that were performed, the medical records contained in the Administrative Record and the Plaintiff's testimony concerning his seizure activity and his activities, the ALJ found Plaintiff's statements regarding the frequency, intensity, duration and limiting effects of seizure activity were not generally credible. (AR 420-21). The ALJ cited the following in support of this credibility determination: CT scans of Plaintiff's brain taken in January 2003 after the re-emergence of seizure activity following a ten year hiatus were normal; the MRI of the brain taken on July 1, 2003 was "unremarkable"; some of the seizure activity was associated with Plaintiff's withdrawal from alcohol; indications in the notes of visits with treating doctors that he denies any syncope or seizure for extended periods of time; that with proper medication seizure activity is reduced; and that Plaintiff admits to driving three times a week, using power tools like a table saw and riding a lawnmower and doing chores such as shoveling snow and shopping. (AR 420).

After reviewing the totality of the evidence, the ALJ found the Plaintiff's statements concerning the intensity, duration and limiting effects of his seizure disorder were only fairly credible. (AR 421). The ALJ recognized that a finding of less than full credibility does not mean that the Plaintiff has no subjective symptoms or seizures but that the focus is on the limiting effect of those symptoms and seizure activity. The ALJ stated that the limitations were

addressed in the residual functional analysis by finding that the Plaintiff can only occasionally balance, bend, stoop, kneel, crouch or squat and has limited ability to climb stairs or ramps. (AR 421).

The ALJ performed the required *Craig* analysis and provided an explicit rationale to support his conclusions. The ALJ found that while Plaintiff's impairments could reasonably be expected to produce the alleged symptoms, the Plaintiff's statements regarding the intensity, duration and limiting effects of the alleged symptoms were not entirely credible. (AR 421).

It is clear that the evidence in the record supports the ALJ's determination that Plaintiff's testimony regarding the extent and limiting effects of his symptoms was less then credible. The record indicates that the ALJ's opinion was based on a full review of the medical evidence before him. Accordingly, the ALJ's conclusions regarding Plaintiff's credibility and residual functional capacity are based on substantial evidence in the record.

**Non-treating physician evidence**

The ALJ also considered Dr. Vinh's Physical Residual Functional Capacity Assessment, completed on December 2, 2003.[10] Dr. Vinh concluded that Plaintiff could perform a full range of light work, finding that Plaintiff could lift 10 pounds occasionally and 20 pounds occasionally, sit for 6 hours in an 8 hour day, stand or walk for 6 hours in an 8 hour day, and use push/pull controls with the upper and/or lower extremities without limit. (AR 358-65, 422). The ALJ acknowledged that Dr. Vinh did not examine the Plaintiff, that he did not include an analysis of Plaintiff's carpal tunnel syndrome and the he did not afford much weight to Plaintiff's pain and the side effects of various medications, all of which could potentially affect Plaintiff's ability to perform light work on a sustained basis. As a result, the ALJ found that Plaintiff was not able to

---

[10] It appears that the Assessment completed on December 2, 2003 was completed by Dr. William Amos, and that the file was reviewed and the assessment affirmed by Dr. Vinh. (AR 365).

perform the full range of light work as opined by Dr. Vinh, but the ALJ did find that Plaintiff was able to perform a significant range of light work. (AR 422).

The ALJ properly considered the length of the treatment relationships, the extent of the treatment relationships, the opinions' support in the record, the opinions' consistency with the record and the treating physicians' specialties. He found that despite the length and extent of Plaintiff's relationships with Dr. Gill and Dr. Hsiao, their findings were insufficiently supported by the record and were in fact inconsistent with substantial evidence in the record. (AR. 421-22). The ALJ properly analyzed the medical opinion testimony of Dr. Gill and Dr. Hsiao, taking into consideration the factors listed in the Regulations. 20 C.F.R. §§ 404.1527, 416.927. When viewed in combination with Plaintiff's lack of credibility and the reasons enunciated therefore, the ALJ properly weighed the medical opinion evidence.

### The vocational testimony did not omit consideration of Plaintiff's limitations

Plaintiff asserts that the vocational testimony did not include consideration of all his functional limitations. (Plaintiff's Mem. in Support of Motion for Summary Judgment, pg. 24-25). In the examination of Mr. Perlman during the March 8, 2007 hearing, the ALJ described a hypothetical person with the following exertional limitations: ability to lift 10 pounds frequently, 20 pounds occasionally and limited ability to push/pull with the dominant upper extremity. The ALJ further described this hypothetical person as having these non-exertional limitations: aged 43-48, high school education, Plaintiff's training and work experience and the person could not do work involving ladders, ropes or scaffolds or work involving crawling. He could occasionally use stairs or ramps, bend or stoop, kneel, crouch or squat. He could feel occasionally with his dominant hand but could not use the dominant arm in an overhead position. Such an individual would have trouble in a noisy environment and should avoid exposure to hazards. He would also

have some limitation in the ability to concentrate, maintain attention for extended periods and keep up with pace. (AR 614-16).

These are the same limitations that the ALJ found primarily to affect Plaintiff's ability to work and are limitations that, in the ALJ's opinion, would result from Plaintiff's severe impairments. While the ALJ did not find thoracic outlet syndrome to be one of Plaintiff's severe impairments, evidence of its symptoms are addressed adequately and incorporated into his hypothetical limitations. Further, the ALJ's omission of a stand/walk limitation in his assessment is logical given his finding that the medical opinion evidence on that issue is not credible and that one of the categories addressed with the vocational expert and relied upon by the ALJ involved sedentary positions. (AR 421-22). Plaintiff complains that his seizure disorder was not considered, but the ALJ expressly discussed the potential effects of Plaintiff's seizure disorder. He found that some seizure activity was associated with sudden reduction of alcohol levels in Plaintiff's blood (AR 420) and that some activity was associated with sub-therapeutic levels of anti-seizure medication. (AR 420). The ALJ found that there were too many inconsistencies in the record to establish the frequency of seizures alleged by Plaintiff; Plaintiff testified at the August 17, 2004 hearing that his last "actual" seizure was in January 2003 (AR 41), but later that he suffered at least three episodes of paralysis of his right side per week. (AR 45-47). He testified at the March 8, 2007 hearing that he has two to three seizures per week (AR 420-21, 576), but that despite the unexpected nature of his seizures, he operates a motor vehicle several times a week, uses a power saw and uses a riding lawnmower. (AR 420, 575, 588, 604).

The ALJ found that the totality of the evidence persuaded him that Plaintiff's statements regarding the frequency, intensity, duration and limiting effects of his subjective symptoms were only fairly credible, and that in particular his statements about the frequency, intensity, duration,

and limiting effects of his seizure activity were not generally credible. (AR 421). He cited to specific examples throughout the record in support of his findings in this regard. The ALJ went on to explain that his finding did not mean that Plaintiff had no subjective symptoms; rather, the focus was on the limiting effects of the pain and seizure activity he suffered. (AR 421). Plaintiff's reduced credibility simply meant that Plaintiff's assertions, alone, were insufficient to "bolster the evidentiary weight up to the level of a preponderance of evidence." (AR 421).[11] Finally, Plaintiff's cognitive problems allegedly resulting from the seizure disorder were addressed as limitations in the ALJ's decision. The ALJ found that there was evidence in the record to support a finding that Plaintiff only retained a moderate ability to concentrate or maintain attention for extended periods, or to keep up a pace due to pain, fatigue, side effects of medication, and emotional factors. (AR 420).

The ALJ's decision properly considered Plaintiff's functional limitations. The ALJ posed a hypothetical to Dr. Perlman which included the limitations that the ALJ found were supported by the record, and adequately addressed the limitations resulting from Plaintiff's severe disorders.

For the reasons stated above, the Court finds that the proper legal standards were applied in evaluating the evidence, that the final decision of the Commissioner is supported by substantial evidence and that it should be affirmed. An appropriate Order will issue.

Entered this 17th day of February 2009.

/s/

John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

---

[11] Plaintiff's reduced credibility also meant that medical source opinions based on his assertions, as such opinions must be to some degree, may be given lesser weight; "[t]o the degree that an opinion is based on stated facts that may not be totally accurate, the opinion itself might not be totally accurate." (AR 421).